JjBYRNES, Judge.
A six-member jury found Becky Harris guilty as charged with cruelty to a juvenile, a violation of La. R.S. 14:93. She was sentenced on June 2, 1999, to serve five years at hard labor. The defendant filed motions for reconsideration of sentence and for appeal, and her motion for an appeal was granted; however, there is no evidence in the record that the hearing on the motion for reconsideration of sentence occurred.
Ms. Mary Bulot of 302 Caroline Avenue in Port Sulphur, testified that when she went outside to walk her dog before 9 a.m. on May 16, 1997, she noticed that the three-year-old boy, who lived across the street from her, was outside by himself, crying. She heard him say, “I lost the baby.” She returned to her house and mentioned to her husband that the child was on the street alone. Ms. Bulot went into her backyard which is next door to her brother-in-law’s yard. She walked close to his property and noted that the gate to the pool was open. She immediately ran to the pool where she saw a small body floating face down on the water. Ms. Bulot rushed into her house and called 911. A deputy from sheriffs department arrived quickly, and the child was pulled from the pool and taken to the hospital. Ms. Bulot said she had lived in the neighborhood for five months. During that time she Lhad observed two very small children outside by themselves on many occasions. They never wore shoes, and most of the time they wore only soiled diapers. Ms. Bulot said she did not see the children every day, but she estimated she saw the children outside by themselves at least four to six times a month. She did not know the children by name, and she knew the mother (the defendant) only because once or twice while she was cutting her grass the mother approached her and asked to borrow a cigarette. Once, during a rainstorm when she was driving away from her house, Ms. Bulot saw the mother and children walking down the street and stopped to offer them a ride. The mother declined the offer and said that they were walking to the corner to visit someone.
Deputy Arthur Ivey of the Plaquemines Parish Sheriffs Office testified that he responded to the. 911 call placed by Mary *1109 Bulot and found the naked child face down in the pool. The deputy pulled the child from the pool and Deputy Rhonda Dykes administered C.P.R. Then the deputy drove the child by ambulance to the hospital. (The child survived, but suffered severe, permanent injuries and is not expected to live long.) Deputy Ivey then returned to the investigation at the child’s home, but by the time he returned, the defendant had been taken away. There were two other children in the home, the three-year-old boy and an infant. He tried unsuccessfully to find some food and clothes for them. The infant’s condition was “really pathetic” in that when the dirty diaper was removed, “everywhere this diaper was, was red. The whole area ... was beet red.” The only food in the house was an opened can of formula. Clothing was all over the floor. There were no beds for the children; the only furniture was a sofa and a few chairs in the living room. There was a mattress on the floor in one room, and clothes were piled over it. When asked about the cleanliness of the house, |sthe deputy said, “I have been in worse houses but it was working its way to being one of them.” When asked if complaints had been filed against the defendant for earlier episodes of neglect, the deputy answered that about 7:30 on the morning of this incident a call had been received that naked children were playing beside the drainage canal that runs behind the houses on Caroline Avenue. The deputy searched the area but did not see the children at that time.
Mr. Cleatus Hodge of 299 Milan Drive in Port Sulphur testified that Trudy, the defendant’s mother, and her boyfriend lived with him. His home is about four houses away from the house where the children and the defendant were staying. On May 15th, the day before the incident, the children came to his house about 7 a.m. by themselves; Mr. Hodge woke up Trudy, their grandmother, to care for them. On the morning of May 16th he had two contacts with the children. The first occurred at 6:30 a.m. when the three-year-old boy and the two-year-old girl again came to his door. The boy was wearing a diaper and the girl had nothing on. Mr. Hodge walked the children back to their house. He found the defendant asleep on the couch and tried to wake her up, but he could not. He was frightened and called 911. Two officers came to the house and woke the defendant up about 7:30 a.m., and Mr. Hodge left. About 8 a.m. the little boy returned to his house. The child told Mr. Hodge that Mimi, his sister, “is in the drainage canal and I can’t get her out.”[1] Mr. Hodge’s stepdaughter called 911, and Mr. Hodge began searching for the child. As he approached Caroline Avenue, he saw cars and soon learned that the child had been found in a pool. Mr. Hodge went to the defendant’s house where a deputy was trying to wake her. Mr. iJHodge had known the defendant about eight months. He found out that she had a sleep disorder after the child’s near-drowning. -He had planned to take her grocery shopping that morning. He also stated that the children were not dressed when he saw them on May 15th and 16th but otherwise they were dressed. After the defendant was taken into custody, Mr. Hodges’s stepdaughter cleaned up the baby and the little boy; Mr. Hodge admitted the baby’s “diaper rash” which was all “blisters” was “terrible.”
Ms. Roxanne Cepriano, the stepdaughter of Mr. Hodge, testified that on May 16th she was driving her van toward Hodge’s house when her stepfather flagged her down and told her that Ros-slyn, the three-year-old boy, had said that his sister was “swimming.” Ms. Cepriano took the boy back to his house. She changed the baby and noted that he had uncooked grits and chocolate milk in his diaper. She said the diaper rash was worse than anything she had ever seen.
*1110 Several other neighbors testified. Mr. Adam Chartier of 291 Caroline Avenue testified that he lived next door to the defendant. Mr. Chartier said he had seen the children in their yard and in his yard. On occasion he had to ask them to move so that he could pull his car into his driveway. The children were also caught playing in his garage where he kept tools that could be dangerous to a child. He never saw the children’s mother watching them.
Ms. Joy Delahoussaye of 312 Caroline Avenue testified that she was living with her mother who lives next door to the defendant’s house, and she noticed the little boy and girl outside unattended “many” times. Ms. Delahoussaye mentioned to Kevin Cunningham that the children should be watched. She said the children were without shoes and not dressed when they were outside.
|BMs. Vicky Everage, Ms. Delahous-saye’s sister, testified that when she was staying at her mother’s house, she saw the children outside alone four times. Once she saw the little boy in his yard with a serrated knife in his mouth. Ms. Everage took the knife from him and went to the door of the house. She knocked on the door for ten minutes, and finally a man answered and thanked her for intervening.
Ms. Pamela Gainey resided at 238 Milan Drive in May of 1997. She testified that she followed Roxanne Cepriano on May 16th and spoke to the little boy who was talking of “his little sister being in the water.” Ms. Gainey told him not to walk away because he was too small to be by himself, and he answered that, “he is a big boy and that he can go wherever he wants and he goes wherever he wants.” He had on a diaper, no shoes, and was covered in chocolate. Ms. Gainey started to change his soiled diaper, but when she saw thé skin on his stomach she stopped. He had a “very, very bad rash.”
Lieutenant Curtis Bowers of the Plaque-mines Parish Sheriffs Office testified that he arrived on Caroline Avenue about twelve minutes after the call came in and found that the victim had already been taken to the hospital. The lieutenant then entered the child’s home through an open door and found the mother sleeping on the sofa. A baby was also sleeping on the sofa. The lieutenant did not see a crib in the house. The house was in “considerable disarray” with “[flood ... all over the floor” and a “huge” knife on the floor in the kitchen. The entire house was “filthy.” Cans of insecticide and household cleaners were on the floor. The lieutenant shook the defendant three or four times and yelled, “Wake up.” It took less than a minute to wake her. Lieutenant Bowers said that he learned that “this wasn’t the first time that the children had come out of the residence. That this was Impossibly an ongoing incident that occurred numerous times.” Once in custody the defendant gave a statement that was videotaped; the tape was played for the jury. No drug tests were given to the defendant who admitted to smoking marijuana a week before this incident.
Ms. Alice Spaulding, an investigator for the Office of Child Protection, testified that she investigated this incident. When she went to the house on May 16 th she found,
first the smell was very bad. When I entered the home, there was a knife laying on the floor by the door. It was a butcher knife. It was about two inches deep.and it was about eight inches long. The dining room table was covered with chocolate syrup .... and raw grits. Also in the bathroom, there was a safety razor lying on the floor with the blade up.
Ms. Spaulding determined that children living in such a state should be deemed neglected, and she took the two children into custody. She spoke to the defendant who told Ms. Spaulding of her many problems. The children’s father had left her, and she had a sleeping problem; she said she needed help.
*1111 Ms. Robin Pannagl of the Social Services Department’s Foster Care Program testified that the little girl, Semaria, is in a nursing home, and her condition continues to deteriorate. She had been in and out of the hospital since the incident and lives only with the aid of several machines.
Dr. Eduardo J. Hernandez, an expert in pulmonary pediatrics and sleep disorders, testified that he treated Semaria Harris at the nursing home. He described her condition as global encephalopathy, a condition in which she is completely dependent on technology and nursing to live. She is at the developmental level of a one-month-old infant. She is on a respirator for air and a gastrostomy tube for nutrition. The muscles of her arms and legs have contracted so as to create deviations on her joints. She suffers seizures. Semaria is not brainjdead7; she reacts to pain. She was three and one-half at the time of trial, and he estimated she could live for as little as several hours or as long as five more years. The doctor also addressed the condition of sleep apnea and described three types of the disorder. When asked if sleep apnea would cause difficulty in waking up, he said it would not because persons suffering from the condition have very shallow sleep. However, under cross-examination when the doctor was asked whether a person who was severely sleep deprived and suffered from sleep apnea could be difficult to arouse, the doctor said he had never seen that in his practice but it could happen.
Kevin Cunningham, a tugboat pilot who worked seven days on and seven days off, testified that in May of 1997 the defendant was staying at his house. On the day in question Mr. Cunningham was piloting a tugboat and left the house at 3:30 a.m.; at that time the defendant was sleeping on the sofa with her youngest child. Mr. Cunningham said the doors of the house were kept locked at night and unlocked during the day. A hasp lock was put on the backdoor so that the children could not get out. He explained that the knife found on the floor had been used the day before to dig holes in the garden. The house is not normally in the condition it was found in on May 16th; the clothes found on the floor had just been given to them, and the children ripped up the bags containing the clothing. The children were never allowed to roam, and Mr. Cunningham did not remember any complaints from the neighbors about the children. Mr. Cunningham said he had known the defendant since she was fifteen. She and Terry, her boyfriend, and the three children moved in with him about eight months prior to the trial. She married Terry, the father of her children, shortly before the trial. Mr. Cunningham said the children slept in the third bedroom where there was a bed. The defendant Uslept in the kitchen or the front room. The cleaning products were kept in a cabinet the children could not open; however, he said that Rosslyn, the three-year-old, could “get anything.” Rosslyn got out of the house on May 16 th by pulling a kitchen chair to the ,door and reaching up to open the latch. Mr. Cunningham occasionally made breakfast for the children while the defendant slept.
Dr. Steven Atkins, an expert in neurology and sleep disorders, testified that he examined the defendant on January 13, 1999, and when he learned that she suspected she had a sleep disorder, he sent her to a sleep study which confirmed that she did have sleep apnea. However, at the time of the test, she was pregnant, and the doctor could not say whether she would suffer from the disorder if she were not pregnant.
In a single assignment of error, the defendant argues that the evidence is insufficient to support the conviction because the State never proved that the defendant was criminally negligent in caring for her daughter.
When assessing the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favor *1112 able to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements 19must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This statutory provision is not a separate test from Jackson, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d at 820.
Cruelty to a juvenile is defined as “the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to the child.” La. R.S. 14:93 A.
The defendant points out that the State argued in closing argument and the trial court gave instructions for criminal negligence. La. R.S. 14:12 defines criminal negligence as existing,
when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
The defendant maintains that the State failed to prove that the defendant’s conduct amounted to a gross deviation from the norm in that it was not clear that the defendant was responsible for the children at all times, and thus the children’s actions and the mother’s responsibility are not clearly linked.
We do not agree. Mr. Hodge, who was sympathetic to the defendant, said that the children arrived at his door very early in the morning of May 16th, and it is clear that on May 16 th the defendant was the person charged with caring linfor the children. Mr. Hodge walked the children home and called the police to awaken their mother, yet she did not then supervise her two-year-old daughter or her three-year-old son. They left the house again with dire consequences for the little girl. Furthermore, the mother had custody of the children. Mr. Cunningham, the other adult in the house, worked offshore. Mr. Hodge suggested that Trudy, the grandmother, sometimes cared for the children, but she did not testify, and no other testimony supported that fact. Moreover, the evidence indicates that no one supervised the children, and they were clearly the defendant’s responsibility.
Additionally, five witnesses testified that the children were often outside unsupervised and were not dressed appropriately. Ms. Balot said she saw them wandering outside between four and six times a month for five months. Mr. Chartier reported that the children were in his yard, his driveway, and his garage, and the defendant was never watching them. Ms. Delahoussaye, too, saw the children outside unsupervised and undressed. Ms. Everage remembered seeing the little boy outside with a knife in his mouth. Mr. Hodge told the court that on May 15th and May 16th the children walked alone to his house very early in the morning. If Ros-slyn was able to get the backdoor open on May 15th and get outside with his sister, it was clear that he could do it again. No precautions were taken to insure that he did not do the same thing again.
*1113 The testimony of these witnesses is sufficient to establish that the defendant’s conduct was a gross deviation below the normal standard of care. Additionally, the witnesses who described the condition of the house set out in painful detail the miserable situation of the children due to their mother’s neglect. |nThere was no food in the filthy house, and a large knife, a razor blade, and cans of cleaning fluids were on the floor. Mr. Cunningham testified that the defendant vacuumed and picked up things in the house. Clearly, the defendant was responsible for the condition of the house and for the dangers encountered by the children living there.
We conclude that the defendant’s conviction must be affirmed. The State produced sufficient evidence for the jury to find beyond a reasonable doubt that this defendant’s conduct exhibited such disregard for the welfare of her child as to amount to a gross deviation below the standard of care expected of a reasonable person. Her negligent conduct was the proximate cause of her daughter’s near-drowning and global encephalopathy.
The defendant points out two errors patent. The defendant first complains that the trial court failed to advise her of the prescriptive period for filing any applications for post-conviction relief under La.C.Cr.P. art. 930.8. This article contains merely precatory language and does not bestow an enforceable right upon an individual defendant. State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197, p. 21 (La.9/5/95), 660 So.2d 1189,1201.
However, in the interest of judicial economy, we note for defendant that La. C.Cr.P. art. 930.8 generally requires that applications for post-conviction relief be filed within three years of the finality of a conviction.
The defendant next argues that her sentence is illegal because she did not receive credit for time served. La.C.Cr.P. art. 880 provides that “[a] defendant shall receive credit toward service of his sentence for time spent in actual custody prior. to the imposition of sentence.” The article was amended in 1997 to make | ^credit for prior custody self-operating in the case of a silent record. Acts 1997, No. 788, § 1. Therefore, the statute does not require court action. State v. Ignot, 29,745 (La.App. 2 Cir. 8/24/97), 701 So.2d 1001, unit denied, 99-0336 (La.6/18/99), 745 So.2d 618.
Because the trial court has not ruled on defendant’s motion to reconsider sentence, we remand this case in order that a ruling may be made. Defendant’s conviction and sentence are otherwise affirmed.

CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.

. The girl's name is Semaria, but her brother called her Mimi.