VICTORY, J.
| ¡We granted this writ application to determine whether defendant can be guilty of second degree murder for leaving her two small children home alone in the middle of the night, during which time a fire broke out and one of her children died in the fire. After reviewing the facts and the applicable law, we find that a conviction for second degree murder cannot be supported in this case, where defendant’s criminally negligent act of leaving her young children alone in the middle of the night was not a “direct act” of killing, but was instead a criminally negligent act of lack of supervision which resulted in her child’s death. For that reason, we reverse the judgments of the lower courts and find defendant guilty of the lesser included offense of negligent homicide.
FACTS AND PROCEDURAL HISTORY
On January 20, 2008, around midnight, S.S., age six, was found unconscious from smoke and soot inhalation inside her burning home. The fire originated on the back right burner of the kitchen stove. S.S.’s mother, defendant Satonia Small, had left S.S. and her brother J.D., age seven, asleep unsupervised in the second-story apartment at about 10 p.m. to go drink at the home of her friend, Patrina Gay. When a neighbor called Gay to tell her about the fire, defendant returned home and | ¡learned that J.D. had escaped by jumping out of a window, but that S.S. was found inside by firefighters, could not be revived, and was taken to the hospital. Defendant was arrested for cruelty to juveniles. A few days later, S.S. died at the *800 hospital,[1] and on March 18, 2008, the grand jury indicted defendant for second degree murder.
On November 10, 2008, the state gave notice that it intended to present evidence at trial that defendant pleaded guilty on May 2, 2007, to criminal abandonment in violation of La. R.S. 14:79.1, committed on December 4, 2006. At a hearing held on May 27, 2009, the state indicated that it intended to introduce at trial a transcript of the colloquy in which defendant pleaded guilty to criminal abandonment. In this colloquy, defendant recognized the gravity of her misconduct and promised she would not leave her children unattended again. The state argued that defendant’s assurance that she would never leave her children alone again was relevant to proving her guilty knowledge and the absence of mistake. The trial court then ruled that the prior guilty plea colloquy would be admissible.
Trial began on August 25, 2010. The state presented 12 witnesses. Two neighbors testified. Ronnie Jackson described how he helped his family and several other residents escape from the burning building, and then saw J.D. right after the child jumped from a second-story window. Jackson was unable to open the locked apartment door to assist S.S. Tamara White testified that she realized the building was on fire at some point after 11 p.m. She called her cousin Patrina Gay, whom she knew was defendant’s friend, and asked her to tell defendant that her apartment was on fire. Four first responders testified. Officer Marcus Hines of the Shreveport |sPolice Department testified that he was off duty when he saw the fire,[2] and when he arrived, the entire upstairs of *801 the building was engulfed in flames. He saw J.D. outside and residents informed him that S.S. was still inside. Officer Hines watched as firefighters extracted S.S. firom the building, performed CPR, and then placed her in an ambulance. Defendant, who smelled strongly of alcohol, arrived about 20-30 minutes later. Sergeant Steven Plunkett of the Shreveport Police Department testified that he responded when Officer Hines reported the fire. Sergeant Plunkett unsuccessfully tried to kick the apartment door open. He saw J.D., who appeared to have trouble breathing, as the child was treated by fire department personnel.[3] Chad Cannella, a fire captain and paramedic for the Shreveport Fire Department, testified that he kicked in the door to the apartment and began searching when the ceiling caved in. The cave-in released some of the |4smoke, which improved visibility and permitted him to find S.S. in a bedroom. Captain Cannella carried S.S., who was not breathing and had no discernible pulse, to the parking lot and began CPR. Captain Can-nella then placed S.S. into an ambulance. Officer Franky Miles of the Shreveport Police Department testified that he saw S.S. transported by ambulance when he arrived. Defendant, whom he described as dressed “like she ... had been out, like to a club or something,” then arrived. He was instructed by his supervisor to Miran-dize her and transport her to the detective bureau.
Three persons involved in the investigation testified. Chris Robinson, fire investigator for the Shreveport Fire Department, testified as an expert in the determination of the cause and origin of fires. During his investigation, he found that a pan had melted to the back right burner where the fire originated. He found no electrical problems, and testified that the fire had progressed from the stove, up through the vent, into the attic, and set the roof on fire. This fire would have produced a lot of smoke. The victim was found in the second room down the hall to the right and the kitchen was in a room to the left. He had investigated about 850 fires with six or seven fatalities, of which 100 were kitchen fires with only one other fatality, and he commented that a kitchen fire is “not a fast-developing fire.” Dr. Frank Peretti, M.D., testified as the medical examiner who performed the autopsy and as an expert in forensic pathology.[4] Dr. Peretti *802 found that S.S. had died |Rof anoxic encephalopathy with pneumonia and complicating smoke and soot inhalation. Dr. Peretti opined that young children often seek cover during a fire rather than escape. Detective Eric Farquar of the Shreveport Police Department testified that he Mir-andized and interviewed the defendant. At the time of the interview, S.S. had not yet died so defendant was under investigation for cruelty to juveniles. Defendant initially told him that she had only gone to McDonald’s to get food for her children. She later admitted that she went to a party at Patrina Gay’s house. The interview was played for the jury.
Two witnesses testified about defendant’s prior guilty plea to criminal abandonment. Jacqueline Martin, minute clerk at Shreveport City Court, testified as records custodian to identify the minute entries for defendant’s prior guilty plea, on May 2, 2007, to criminal abandonment. The minute entries indicated that defendant was fined $50, sentenced to 60 days, suspended, placed on one year probation, and instructed to take parenting classes. Martin also read from the guilty plea colloquy, in which defendant assured the judge that she would not leave her children alone again. Officer Brandon Chandler with the Shreveport Police Department testified that he had investigated the criminal abandonment charge. A concerned person had called to report that two small children were left alone outside in inclement weather. When he arrived, Officer Chandler found S.S., age four, and J.D.,' age five, alone in the residence and the home in an unhealthy, deplorable condition. Officer Chandler identified photographs showing the | (¡condition of the home. Officer Chandler indicated that the children were removed from the home and from defendant’s custody.
Defendant’s friend Patrina Gay also testified. Gay indicated that on the morning of the fire she made plans with defendant to get together that evening. Gay picked defendant up and did not know who was supervising defendant’s children. They stopped at a liquor store and then arrived at Gay’s home at about 10 p.m. Her cousin called about the fire at about midnight, by which time defendant was a little intoxicated. They drove back to defendant’s apartment and when they arrived, defendant was apprehended by police. The defense presented no witnesses.
During opening remarks, the defense conceded that defendant neglected her children, but argued that the fire was an unforeseeable accident and that defendant was guilty of negligent homicide rather than second degree felony murder. During closing remarks, the state argued that defendant’s prior neglect proved that she did not simply make an isolated mistake on the night of the fire. The state also argued that the jury could infer from the low fatality rate associated with kitchen fires that if defendant had been home she could have ushered S.S. to safety. In closing, the defense argued that, because defendant’s act of neglect did not directly cause S.S.’s death, defendant was not guilty of second degree felony murder. During closing remarks and the bulk of rebuttal, the state argued that a verdict of guilty of negligent homicide would.not fit the facts of the case (and would deprecate the egregiousness of defendant’s misconduct) in which defendant demonstrated a pattern of gross neglect.
*803 Jurors were instructed that they could return a verdict of guilty of second degree murder, guilty of manslaughter, guilty of negligent homicide, and not |7guilty. The twelve-person jury deliberated for two hours before unanimously finding defendant guilty on August 26, 2010, of second degree murder.
On September 18, 2010, defendant filed a motion for post-verdict judgment of acquittal or in the alternative for judgment of conviction of negligent homicide, in which she argued, inter alia, that the evidence was insufficient to prove a direct causal link between her action in leaving the children unattended and the accidental fire. Also on that date, defendant filed a motion to find the statutorily-mandated life sentence constitutionally excessive as applied to her.[5] At a hearing held on September 20, 2010, on the defendant’s motions, defendant argued that Louisiana jurisprudence has consistently declined to find defendants criminally culpable for felony murder when the victim’s death is only proximately caused by the defendant’s actions. Defendant also presented evidence in support of her claim that a sentence of life imprisonment without parole would be constitutionally excessive.[6]
On September 30, 2010, the district court denied defendant’s motions and sentenced her to life imprisonment at hard labor without benefit of parole, ^probation, or suspension of sentence. On October 7, 2010, defendant filed a motion to reconsider sentence in which she contended the trial court erred in finding that the court lacked the authority to determine whether the statutorily-mandated life sentence was constitutionally excessive when applied to her. After the district court denied the motion to reconsider sentence, defendant appealed.
The court of appeal affirmed the conviction and sentence. State v. Small, 46,682 (La.App. 2 Cir. 11/16/11), 78 So.3d 825. First, the panel indicated that it found the evidence sufficient to support the underlying felony of cruelty to juveniles and establish a legal causal connection between the underlying felony and the child’s death:
A 12-person jury unanimously found defendant guilty of second degree murder. Reviewing the evidence presented at trial, we find that the jury could have reasonably determined that defendant’s conduct in leaving her two young children home alone late at night without thought of the potential dangers they *804 could have encountered in her absence, i.e., an intruder or burglar, an injury caused by horseplay between the children, the ingestion of medications or ordinary household poisons or chemicals improperly stored, an emergency caused by inclement weather, or as happened in the instant case, a fire, amounted to a gross deviation below the standard of care expected from a reasonably careful person under like circumstances and therefore constituted criminal negligent neglect which caused unjustifiable pain or suffering (La. R.S. 14:98) and/or serious bodily injury or neurological impairment (14:93.2.8) and which ultimately resulted in her daughter’s death. We cannot question the jury’s determination on this factual issue.
Small, 78 So.3d at 831-32. Second, the panel rejected defendant’s contention that Louisiana’s second degree felony murder provision is unconstitutionally vague because it does not explicitly include a causation requirement and is indistinguishable from negligent homicide:
We conclude that cruelty to juveniles does pose a special danger to human life in the abstract and may properly serve as a predicate to a felony murder charge. Defendant’s extreme indifference endangered the welfare and safety of these very young children and defendant should have foreseen the possibility of harm or injury. La. R.S. 14:8 provides that criminal conduct, even when based only on | ncriminal negligence as in the instant case, is conduct that produces criminal consequences. Furthermore, while defendant’s conduct may be punishable under more than one criminal statute, prosecution is permitted under any applicable statute. See La. R.S. 14:4. Thus, we must reject this argument.
Id. at 832. Third, the panel found that the trial court did not abuse its discretion in admitting evidence pertaining to defendant’s prior conviction for criminal abandonment:
The evidence of the prior incident of abandonment, including the plea colloquy and the photographs of defendant’s cluttered and dirty apartment, demonstrates a history of neglect. It has value to show the improbability or unlikelihood that defendant acted unknowingly or by mistake or accident when she neglected her parental responsibilities and left her two children asleep in a locked apartment to go drinking with a friend.
Further, we note that child abuse and neglect differs from other crimes in that it is done in secret, in the privacy of a home, and against a child too young to call for help. Such neglect is usually not confined to one instance but is likely to be part of a systematic pattern. A pattern, plan or scheme of neglect is relevant and admissible as other crimes, wrongs, or acts evidence.
Id. at 833 (citation omitted).[7] Fourth, the panel found that the mandatory sentence *805 of life imprisonment without parole is not constitutionally excessive in this case:
|inWe find, as did this court in State v. Woods, [44,491 (La.App. 2 Cir. 8/19/09), 16 So.3d 1279], that the gravity of the instant offense and the culpability of defendant, who had a prior conviction for child abandonment for leaving her young children unsupervised to go out with a friend, warrants no downward departure from the legislatively mandated life sentence.
Id. at 834.
We granted defendant’s writ application to determine whether the facts of this case support a second degree murder conviction, especially concerned that the criminal act of defendant was lack of supervision, and not a direct act by defendant which killed her daughter. State v. Small, 11-2796 (La.5/31/12), — So.3d —.
DISCUSSION
Defendant was found guilty of second degree murder in violation of La. R.S. 14:30.1(A)(2), which provides “[s]econd degree murder is the killing of a human being: ... When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.” (Emphasis added).[8] This section of La. R.S. 14:30.1 contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving mens rea accompanying a homicide — the underlying felony supplies the culpable mental state. The underlying felony that defendant was found to have committed was cruelty to juveniles, which is defined in La. R.S. 14:93(A)(1) as the “intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen 1 nwhereby unjustifiable pain or suffering is caused to said child.”[9] Essentially, the state argued that defendant was criminally negligent for leaving her young children unsupervised and that her absence caused her daughter to die in the fire.
The requisite mental state for a crime of criminal negligence is as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such dis *806 regard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
La. R.S. 14:12. This is the same mental state as required for negligent homicide, which is “the killing of a human being by criminal negligence.” La. R.S. 14:32.
Before this Court, defendant argues that she is not guilty of second degree murder, the underlying felony of cruelty to juveniles,[10] or even negligent homicide, 112because the evidence was insufficient to prove that her absence from the home caused her daughter’s death.[11] Defendant contends that the evidence failed to establish a sufficient causal nexus between her absence and the accidental fire that killed the victim, and emphasizes that the victim died because of the intervening circumstance of the accidental fire rather than directly from defendant’s own action in leaving the children unsupervised.
Generally, this Court has interpreted the felony murder rule to require that a direct act of a defendant or his accomplice cause the death of the victim and has refused to hold persons criminally culpable for setting in motion chains of events that ultimately result in the deaths of others. State v. Myers, 99-1849 (La.4/11/00), 760 So.2d 310; State v. Kalathakis, 563 So.2d 228 (La.1990); and State v. Garner, 238 La. 563, 115 So.2d 855 (1959). In the context of felony murder, this issue arises most often when death results from the responses of third parties *807 fleeing, resisting, or pursuing a defendant. In Garner, this Court adopted the “agency test,” which is also utilized by at least 14 other states[12] and restricts criminal culpability |13to deaths directly caused by the defendant and co-felons, and rejected the “proximate cause” test, which holds the defendant responsible for all deaths that foreseeably result from the acts of defendant and co-felons.
In Garner, the state charged Robert Garner with manslaughter in the death of George Carson. Carson, a bystander, was accidentally shot by a bartender who was defending himself against Garner, who had attacked the bartender with a knife. In quashing the prosecution, the trial judge emphasized:
The deceased was killed by a shot from a pistol fired by the bartender who was shooting at the defendant, Robert Garner, in self defense. So that the defendant is not the actual and immediate killer of the deceased.
Garner, 115 So.2d at 857 (quoting from the trial judge’s per curiam). On appeal, the state argued that Garner was guilty of felony manslaughter because he was attempting to murder the bartender when he “set into motion a train or series of events” that resulted in Carson’s death and “there was no third intervening, independent force which manifested itself so as to divest the defendant of his criminal responsibility.” Id. at 858. This Court, however, after reviewing the jurisprudence of other jurisdictions, rejected the state’s theory and instead strictly construed the pertinent criminal statutes and applied the rule of lenity[13] to And that Garner could not be held criminally liable for Carson’s death. Id. at 864. We held that by employing the term “offender” in the felony manslaughter statute, the legislature prescribed that the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing. Id.[14]
114This reasoning was followed in Kalathakis, where Anita Kalathakis was convicted of felony manslaughter in the death of Larry Calhoun. Calhoun was shot by officers during a raid on a trailer in which methamphetamine was being manufactured. During the raid, Calhoun fled the trailer and fired at officers, who then returned fire. Kalathakis remained inside the trailer and pointed a pistol at officers as another accomplice attempted to dispose of chemicals in the adjacent bathroom. The court of appeal affirmed the conviction concluding that Calhoun died as *808 a result of defendant’s action in attempting to manufacture drugs:
The court reasoned that the drug manufacturers’ arming themselves, as part of the overall scheme, set into motion a chain of events which created a great risk of harm and that Calhoun’s death was “within the ambit of reasonable foreseeable possibilities.”
Kalathakis, 563 So.2d at 230 (quoting State v. Kalathakis, 543 So.2d 1004, 1008 (La.App. 3 Cir.1989)). Kalathakis appealed her conviction citing Garner, which the state distinguished by noting that the victim in Garner was an innocent bystander, whereas in Kalathakis, the victim was a co-perpetrator of the underlying felony. This Court rejected the state’s distinction and refused to modify Garner, finding that the shooting was too attenuated for defendant’s criminal acts to be considered the legal cause of the victim’s death. Further, we held that “even if we were inclined to modify Garner by adopting a less restrictive theory of causation in felony-manslaughter cases, the evidence in the present case was insufficient for a rational juror to conclude that defendant’s conduct related to the manufacturing of drugs was a substantial factor in bringing about Calhoun’s death.” Id. at 233.
Garner’s requirement of a direct act of killing was recently reaffirmed in Myers, supra. In that case, Robert Myers was convicted of manslaughter in the death of Detective Joseph Thomas and Myers’ accomplice/roommate Jessie Lopez. | ifiLopez shot the detective and was then himself shot by police while police executed a search warrant after observing defendant selling narcotics from a residence. This Court found that defendant was guilty as a principal to the shooting of Detective Thomas but not criminally liable for another detective’s act of shooting Lopez in self-defense:
We are forced to conclude, as did the Garner court, that by employing the term “offender” in the felony manslaughter statute, the legislature has prescribed that the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing. Taken in the context of the surrounding words, the term “offender” plainly refers to the person who performed the act of killing while simultaneously engaged in the perpetration of an unenumerated felony. The “offender” may also be any person jointly engaged in the felonious activity with the actual killer according to the well established rule that all persons concerned in the commission of a crime are liable for the criminal acts of the other participants. La. R.S. 14:24; State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1224. However, because the statute defines felony manslaughter to include only those killings committed by one acting in furtherance of a felony, it precludes criminal liability for deaths that are not at the hands of a defendant or his co-felons.
Myers, 760 So.2d at 315. In doing so, we rejected the theory that “a defendant is liable for ‘any death proximately resulting from the unlawful activity-notwithstanding the fact that the killing was by one resisting the crime.’ ” Id. at 316 (quoting State v. Lowery, 178 Ill.2d 462, 227 Ill.Dec. 491, 687 N.E.2d 973, 975-76 (1997)). The Myers court explained that the proximate cause theory “is often limited by the requirement that the death be a foreseeable consequence of the felony.” Id. We found that Louisiana’s approach adopting the “agency” theory was consistent with the majority of jurisdictions, which decline to find guilt under a felony murder theory when a victim’s death is attributable to a person other than the defendant or defen *809 dant’s co-perpetrators. Id. at 315-16 (footnote and citations omitted).
11fiThus, the agency test adopted in Louisiana requires that a “direct act” of the defendant or his accomplice commit the act of killing. Where a second degree murder is based on the underlying crime of cruelty to juveniles or second degree cruelty to juveniles, and that conduct involves the criminal negligence of lack of supervision, there is no “direct act” of killing; instead the act is a negative act. State v. Martin, 539 So.2d 1235, 1238 (La.1989) (“Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring the accused to intend some consequence of his actions, criminal negligence is found from the accused’s gross disregard for the consequences of his actions”). This makes the lack of a direct act of killing by the defendant in this case troubling under the agency test.
The agency test is based on the rationale that “by employing the term ‘offender’ in the felony [murder] statute, the legislature has prescribed that the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing.” Myers, supra at 315. Even though this case is distinguishable from Garner and Myers in that there is no third party involved causing the death, those cases still require that the “offender” perform the direct act of killing, and we see no necessity that a third party commit an act of killing in order to apply the agency doctrine. Furthermore, the flip side of this Court’s adoption of the agency test is a rejection of the “proximate cause” test and this rejection applies equally in this case; therefore, defendant simply cannot be guilty of second degree murder merely because a death proximately resulted from her conduct.
In addition, we note that La. R.S. 14:2(B)(3) lists second degree murder as a “crime of violence,” which is defined as “an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or h property of another, and that, by its very nature, involves a substantial risk that physical force will be used in committing the offense ...” Cruelty to juveniles and second degree cruelty to juveniles[15] are the only crimes included in the felony murder rule’s list of enumerated felonies that can be committed by an act of neglect.[16] All of *810 the others involve physical force or the substantial risk of the use of |1Rphysical force. While neglect can be interpreted to include lack of supervision, to use the cruelty to juveniles statutes to extend second degree felony murder into the realm of lack of supervision removes the use of any “physical force” or the “substantial risk of physical force” that these crimes of violence entail.
We are mindful of the legislature’s prerogative to allow a prosecution for second degree murder by including cruelty to juveniles based on criminal neglect as an underlying predicate felony. However, neglect takes many forms, and neglect in the form of lack of supervision simply cannot supply the direct act of killing needed for a second degree felony murder conviction.[17] To the contrary, cases where second degree murder convictions have been affirmed based on an underlying felony of cruelty to juveniles have not involved lack of supervision, but have involved some direct act of negligence which killed the victim. For instance, in State v. Woods/State v. Scott, 44,491/44,492 (La.App. 2 Cir. 8/19/09), 16 So.3d 1279, writ denied, 09-2084 (La.4/9/10), 31 So.3d 380, the parents committed second degree murder by switching from infant formula to diluted milk, which resulted in five-month-old baby’s death from malnutrition, and where witnesses testified the child was visibly emaciated and his death was not sudden. In State v. Booker, 02-1269 (La.App. 1 Cir. 2/14/03), 839 So.2d 455, writ denied, 03-1145 (La.10/31/03), 857 So.2d 476, defendant’s second degree murder conviction was upheld where the immediate cause of the child’s death was hypothermia from being left in a cold room. In addition, the child’s weakened physical condition, which was due to malnourishment and Battered *811 Child Syndrome, hastened her death, and | ^medical testimony supported the conclusion that the child was beaten severely, possibly rendered unconscious, tied up, and left in the unheated room. In other cases in which a second degree murder conviction has been upheld based on cruelty to a juvenile, the defendant committed direct acts of abuse. State v. Tensley, 41,726 (La.App. 2 Cir. 4/4/07), 955 So.2d 227, unit denied, 07-1185 (La.12/7/07), 969 So.2d 629 (child beaten to death); State v. Miller, 06-595 (La.App. 3 Cir. 9/27/06), 940 So.2d 864, writ denied, 06-2577 (La.5/11/07), 955 So.2d 1278 (shaken baby syndrome); State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171, writ denied, 02-0206 (La.l/31/03), 836 So.2d 57 (same).
In this case, the court of appeal affirmed the conviction finding that defendant’s criminally negligent lack of supervision “ultimately resulted in her daughter’s death.” 78 So.3d at 832. This is essentially an application of the proximate cause test, which this Court has specifically rejected in felony murder cases. In reviewing this conviction, we are bound by the rule of lenity which requires that “where there is any doubt as to the interpretation of a statute upon which a prosecution is based, doubt must be resolved in favor of the accused.” See supra note 13; Garner, supra at 864, n. 3. Reading the second degree murder statute in conjunction with the cruelty to juveniles and second degree cruelty to juveniles statutes creates doubt as to whether lack of supervision was intended by the legislature as a underlying felony sufficient for a second degree murder conviction. An interpretation of the felony murder statute to allow a second degree murder conviction anytime a parent is criminally negligent in failing to supervise her child and the child dies as a result of some intervening act would be contrary to the rule of lenity and could result in unintended consequences.
|2nBased on the statutory language requiring a “killing of a human being ... when the offender is engaged in the perpetration of [an enumerated felony],” the legislative definition of second degree murder as a crime of violence, the jurisprudence requiring a killing as a result of a direct act by the defendant, the Court’s rejection of the proximate cause test in felony murder cases, and the rule requiring interpretation of doubtful statutes upon which a conviction is based in favor of the accused, we find that the evidence in this case is insufficient to sustain a second degree murder conviction. “[T]he Legislature is presumed to have enacted a statute in light of preceding statutes involving the same subject matter and decisions construing such statutes ...” State v. Johnson, 03-2993, p. 14-15 (La.10/19/04), 884 So.2d 568, 577 (quoting Louisiana Civil Service League v. Forbes, 258 La. 390, 414, 246 So.2d 800, 809 (1971)).
However, unlike second degree murder, negligent homicide does not require a “direct act” of killing by the defendant. Negligent homicide is “the killing of a human being by criminal negligence.” La. R.S. 14:32. “Criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.” La. R.S. 14:12. Ordinary negligence does not equate to criminal negligence; the state is required to show more than a mere deviation from the standard of ordinary care. State v. Jones, 298 So.2d 774 (La.1974). There can be no debate that defendant’s conduct was criminally negligent, especially because she had previously pled *812 guilty to child abandonment and knew leaving her young children alone unsupervised was against the law.
|^Regarding causation, this Court has addressed the type of causal connection the state must show between a defendant’s conduct and the victim’s death for a defendant to be criminally culpable where multiple causes led to the death. In State v. Matthews, 450 So.2d 644 (La.1984),[18] we held that “[i]t is not essential that the act of the defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, medi-ately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient.” Matthews, 450 So.2d at 646 (quoting State v. Wilson, 114 La. 398, 38 So. 397 (1905) (involving death from pneumonia caused by gunshot wound)). The Matthews court noted that a similar standard for determining causation-in-fact approved by LaFave and Scott in their treatise on substantive criminal law was adopted by the Court in State v. Durio, 371 So.2d 1158 (La.1979). Matthews, 450 So.2d at 646. In Durio,[19] this Court found that the state could establish causation by showing that the “defendant’s conduct was a substantial factor in bringing about the forbidden result.” Durio, 371 So.2d at 1163-64.[20] In State v. Martin, supra, we upheld Martin’s conviction as a principal to negligent homicide even though it was his partner in a drag race who struck the victim’s vehicle. We held that Martin’s | ^participation in the drag race was a “substantial factor in the victim’s death.” 539 So.2d at 1239.
In the present case, there was little direct evidence relating to the fire. Presumably, the fire had not started at the time defendant left the home, at approximately 10:00 p.m. Sometime after 11:00, a neighbor noticed the fire and called Ms. Gay. When the fire department arrived at the apartment building, the upstairs was engulfed in flames, and after the roof caved in, the firefighters were able to find S.S. in her bedroom. The fire investigators determined that a pan had melted to the back right burner where the fire originated, and that the fire had progressed from the stove, up through the vent, into the attic, and set the roof on fire. Testimony established that this fire would have produced a lot of smoke. Evidence was presented that the child victim suffered carbon monoxide poisoning from what is typically a slowly developing kitchen fire, which type of fire typically has a very low fatality rate, and further that young children typically respond inappropriately to *813 fire and are thus less likely than adults to escape without assistance.
The trial court rejected defendant’s contention that the child’s death was not causally connected to neglect:
During trial, the State proved beyond a reasonable doubt that the fire was caused by a pot left on a burning stove-top. The pot became so hot that it melted and caused a kitchen fire, which spread throughout the entire home. It is unclear whether the defendant left the stove on before she left the home, or if during her absence one of the children was responsible for turning on the stove. Under either possibility, had the defendant been home or provided adult supervision, the children could have been removed from the home, the fire could have been stopped earlier, or the fire could have been avoided all together. This fire was not a purely coincidental occurrence on which the defendant’s absence had no effect. This was not an electrical fire caused by faulty wiring or a fire caused by lightning striking the home. This fire was directly linked to the defendant’s negligent conduct and the victim’s death was a consequence of that underlying felony;....
⅛⅛ reviewing the sufficiency of evidence to support a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Desoto, 07-1804 (La.3/17/09), 6 So.3d 141. Using this standard, we find that the evidence, viewed in the light most favorable to the state, was sufficient to convince a rational trier of fact that defendant’s neglect was a legal cause of her daughter’s death. A rational trial of fact could certainly have found that had defendant not left her children unsupervised, either the fire would not have occurred or she and the children would have been able to escape to safety before the apartment was engulfed in flames. Because the child died as a result of defendant’s criminal negligence, she is guilty of negligent homicide.
Defendant also contends that evidence pertaining to her prior conviction for child abandonment should have been excluded because it was more prejudicial than probative. Defendant argues that, while the state ostensibly used her prior guilty plea to criminal abandonment to prove absence of mistake, photographs showing the deplorable condition of defendant’s home at the time of the prior offense were used to inflame the jury. The state responds that the photographs of the home at the time of the prior offense were admissible to rebut the defense’s implication that the victim simply died as the result of a terrible mistake. Generally, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. State v. Brown, 395 So.2d 1301, 1314 (La.1981). Specifically, photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs |24any prejudicial effect. State v, Lindsey, 404 So.2d 466, 475 (La.1981). Moreover, “[t]he trial court has considerable discretion in the admission of photographs [and] its ruling will not be disturbed in the absence of an abuse of that discretion.” State v. Gallow, 338 So.2d 920, 923 (La.1976). Abuse of discretion can be found only if it is clear that the photographs’ probative value is substantially outweighed by their prejudicial effect. Cf. State v. Martin, 93-0285 *814 (La.10/17/94), 645 So.2d 190, 198. Here, defendant does not argue that the fact that she previously pled guilty to criminal abandonment was not admissible or that the admissibility of the photographs should have been determined in a pre-trial hearing; defendant argues that the photographs are at best only marginally relevant and that their prejudicial effect clearly outweighs any probative value. The state contends that the photographs were relevant to establishing intent, guilty knowledge, and the absence of mistake or accident.
“Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.” La. R.S. 14:12. Criminal negligence is an element of the crime of second degree murder alleged in this case as well as negligent homicide. Evidence that defendant previously pleaded guilty to criminal abandonment has probative value to show the improbability that defendant acted without the requisite intent or accidentally when she again left the children unsupervised. Cf. State v. Galliano, 02-2849 (La.1/10/03), 839 So.2d 932.[21] The state may fairly argue here that evidence defendant l^had been placed on notice by her prior conviction of the criminal consequences flowing from her neglect of her children bore on the jury’s assessment of her moral culpability in neglecting them again. See Old Chief v. U.S., 519 U.S. 172, 188, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997)(“[T]he prosecution may fairly seek to place its evidence before the jurors as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally responsible as much as to point to the discrete elements of a defendant’s legal fault.”) (citations omitted). Further, it is relevant to show this was not mere ordinary negligence.
While the photographs of the apartment in which defendant previously left the children are more problematic, they show that defendant was a neglectful parent, and were used to show that her previous apartment presented a fire hazard. In any event, even assuming the court erred in admitting photographs showing the unclean conditions of defen *815 dant’s prior residence, the erroneous introduction of irrelevant evidence is subject to harmless-error review. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 102 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict “surely unattributable” to error) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)); State v. Wille, 559 So.2d 1321, 1332 (La.1990) (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Although the evidence that defendant kept the prior residence in a deplorable state impugned defendant, the verdict appears unattributable to the evidence, for the reasons provided by the concurrence in the court below, and given defendant’s own admission that she left the children alone at night to go drinking and that there was no súggestion that the present apartment was not clean or that the fee was caused by the condition of the home.
Finally, defendant argues that the statutorily mandated life sentence is constitutionally excessive when applied to her in light of her limited capacity, and that the trial judge erred in finding that he lacked the authority to impose a lesser sentence. In light of our reversal of the second degree murder conviction, this argument is moot.
CONCLUSION
While the felony murder rule dispenses with the necessity of proving mens rea accompanying a homicide because the underlying felony supplies the culpable mental state, the physical element of the defendant’s act or conduct in causing the death must still be proven. Under our jurisprudence, the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing. By including cruelty to juveniles as an underlying felony in the felony murder statute, the legislature has created a situation where a defendant can be guilty of second degree murder based on an act of neglect. However, where the criminally negligent act is a lack of supervision, there is no direct act of killing by the offender. To interpret the felony murder rule to include lack of supervision as the underlying felony is contrary to the legislature’s classification of second degree murder as a crime of violence. Because there is doubt that the legislature intended to expand second degree murder to a case such as this, we apply the rule of lenity 127to overturn defendant’s conviction for second degree murder. Here, the risk that a fire would occur while defendant left her children unsupervised in the middle of the night to go out drinking and that one of her children might die in the fee was a foreseeable result of her neglect and her conduct was a substantial factor in her child’s death. While that is sufficient for a negligent homicide conviction, it is not sufficient for a second degree murder conviction.
DECREE
For the reasons stated herein, defendant’s conviction for second degree murder is reversed and judgment is entered. The case is remanded to the trial court to resentence defendant for violating La. R.S. 14:32(A)(1).
REVERSED AND REMANDED.
GUIDRY, J., dissents and assigns reasons.
CLARK, J., dissents for the reasons assigned by Justice GUIDRY.

. S.S. was admitted to the hospital with carbon monoxide poisoning on January 20, 2008. She never revived. She was declared brain dead on January 25, 2008. Her heart stopped beating on January 29, 2008, after a court authorized the removal of the ventilator. According to the coroner's report, S.S. died of anoxic encephalopathy with pneumonia and complicating smoke and soot inhalation.

. During this officer’s testimony, the court, out of the presence of the jury, addressed the state’s intention to present photographs showing the condition of defendant's prior residence at the time she pleaded guilty to criminal abandonment. Defendant objected to these photographs as irrelevant and inflammatory. The state responded that the photographs related to the prior crime, which had already been determined to be admissible, and that they showed that defendant previously left her children alone in conditions that constituted a fire hazard. The district court found that the photographs of the prior apartment were admissible:
The Court does find that the probative value outweighs the prejudicial value with regard to these photographs. And as I stated at the bench, even aside from the defendant's prior conviction in City Court, the Court finds that these photographs have a probative value which outweighs the prejudicial value. And the example that comes to my mind is that let’s say these photographs were taken without regard to any prior conviction of the defendant, simply by a family member or neighbor or concerned citizen that the children are living in less than appropriate household, ... that has a probative value. And, of course, the state has the burden of proving beyond a reasonable doubt that the defendant was negligent as an essential element of this crime. The photographs do show a very, very unclean, unkempt house, which not only is inappropriate for children to live in, in my opinion, but certainly inappropriate to leave children of this age unattended. Additionally, the clutter in the house shows that it is certainly a fire hazard. So for those reasons the Court finds that the probative value does outweigh the prejudicial value, and the Court would allow those photographs in regardless of the defendant’s prior conviction in City Court.
The court did find that some of the photographs were cumulative and therefore limited the state to presenting just one photograph per room. The photographs were not admitted during Officer Hines’s testimony.

. This officer also briefly stated that J.D. told him that "they started to cook something and it caught on fire” before the state interrupted. The defense did not object.

. During Dr. Peretti's testimony, out of the presence of the jury, the court again addressed the admissibility of photographs of defendant’s prior apartment at the time she pleaded guilty to criminal abandonment. The defendant again argued that photographs were more prejudicial than probative. The court disagreed:
The photographs of State's Exhibits 17 through 23 show an apartment that the defendant lived in with her children that are — it's just complete deplorably conditions. There is trash piled up everywhere, there is a bathtub with a large amount of water in it, it’s filthy, it's just deplorable. However, the defendant — that evidence is not to be used to show the character of the victim or that she acted in conformity therewith, but may be used to show absence of mistake or intent. The defense in this case is that she made a bad choice on the night that she left her children alone. And the State should be allowed to show that this was not just an absence of mistake or an absence of intent. They should be allowed to introduce evidence to show that in the past that the defendant has left her children in what is depicted as very deplorable conditions, whether she was present with them or not. So under the exception of 404(B) to show an absence of mistake or accident or intent the Court finds that these photographs are certainly probative to that value, to that respect, and that the probative value outweighs the *802 prejudicial value, particularly when the defendant’s defense is, I simply made a mistake on the night in question.
The court again indicated that the state would be limited to introducing one photograph per room. The photographs were not admitted during Dr. Peretti’s testimony.

. In that motion, defendant alleged that she was repeatedly raped by her step grandfather at age 11, and she suffered a traumatic head injury at age 16. Defendant further alleged, as a result of the abuse and head injury, that she suffered from poor impulse control and a reduced capacity to regulate her behavior.

. Psychologist Mark Vigen testified as an expert in clinical and forensic psychology. Dr. Vigen and Dr. James Pinkston, a neuropsy-chologist, had performed a preliminary evaluation of defendant. According to Dr. Vigen, defendant has deficits in learning, processing speed, memory, abstract reasoning, problem solving, judgment, and insight. Behaviorally, Dr. Vigen indicated that defendant is impulsive, disinhibited, anxious, suspicious, and has poor emotional control. Dr. Vigen opined that these deficits are consistent with the frontal lobe damage defendant sustained in a car accident at age 16 and the psychological trauma that resulted from her sexual abuse. Dr. Vigen indicated that defendant sustained an extensive skull fracture in this accident that required the surgical removal of up to 4 cm of necrotic tissue from certain regions of her frontal lobe. Dr. Vigen also noted that school records indicate that, after the car accident, defendant became more combative, impulsive, and disinhibited. According to Dr. Vigen, defendant lacks the ability to consistently exercise sound judgment, self-regulate her behavior, and control her impulsivity. Dr. Vigen also noted that defendant was molested at about age 11 and was raped at 18.

. One member of the panel concurred and would find that the admission of photographs showing the condition of the residence at the time of the prior offense was harmless error:
The district court allowed a recitation of the plea colloquy from the prior offense, and the testimony of Officer Chandler, who investigated that incident; beyond this, the color photos of Ms. Small’s prior apartment were sorely irrelevant and grievously prejudicial. They show that in 2006, she was an ineffective housekeeper and parent, but they depicted a different apartment and did not prove that the place that burned in January 2008 was in a similar state prior to the fire. Her act of neglect in the instant offense was a temporary absence from the home, not her slovenly domestic skills. There was no evidence that the January 2008 fire was more likely to start or spread because of a cluttered floor. Keeping a dirty house in 2006 is simply not relevant to *805 the charge of leaving the children alone in 2008, but it definitely smeared Ms. Small as a bad person. This is precisely the type of prejudice that Art. 403 forbids.
Nonetheless, the verdict rendered was "sure unattributable to this error." State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94, 100. I therefore concur in affirming Ms. Small's conviction and sentence.
Small, 78 So.3d at 834 (Moore, J., concurring).

. Cruelty to juveniles was added to the group of enumerated felonies included in the felony murder rule in 1997.

. Second degree cruelty to juveniles is also a predicate felony offense for a second degree murder conviction under La. R.S. 14:30.1(A)(2). Second degree cruelty to juveniles is defined as "the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.” La. R.S. 14:93.2.3. Because the child in this case died, it is immaterial whether we analyze this case in terms of cruelty to juveniles or second degree cruelty to juveniles.

. Defendant concedes that she neglected the victim and that the victim suffered in the accidental fire but argues that the evidence did not show that the fire was caused by her neglectful absence. Defendant characterizes the present conviction as an unprecedented expansion of the cruelty to juveniles statute. The state responds by referring the Court to State v. Harris, 99-2969 (La.App. 4 Cir. 6/14/00), 765 So.2d 1107, writ denied, 00-2117 (La.5/25/01), 792 So.2d 754. In Harris, the defendant was convicted of cruelty to a juvenile and her conviction was upheld on appeal. Her two-year-old daughter Semaria was found nearly drowned in a pool (and, as a result, was permanently disabled). Semaria and her three-year-old brother were left unattended while their mother slept, which was a common occurrence. The court of appeal found that the state established that the defendant grossly neglected her children, which resulted in her daughter's permanent disability:
The testimony of these witnesses is sufficient to establish that the defendant’s conduct was a gross deviation below the normal standard of care. Additionally, the witnesses who described the condition of the house set out in painful detail the miserable situation of the children due to their mother's neglect. There was no food in the filthy house, and a large knife, a razor blade, and cans of cleaning fluids were on the floor. Mr. Cunningham testified that (he defendant vacuumed and picked up things in the house. Clearly, the defendant was responsible for the condition of the house and for the dangers encountered by the children living there.
We conclude that the defendant’s conviction must be affirmed. The State produced sufficient evidence for the jury to find beyond a reasonable doubt that this defendant's conduct exhibited such disregard for the welfare of her child as to amount to a gross deviation below the standard of care expected of a reasonable person. Her negligent conduct was the proximate cause of her daughter’s near-drowning and global encephalopathy.
Harris, 765 So.2d at 1113. However, neglect, rather than causality, was at issue in Harris. See id., 765 So.2d at 1111 ("In a single assignment of error, the defendant argues that the evidence is insufficient to support the conviction because the State never proved that the defendant was criminally negligent in caring for her daughter”). We note that our determination that felony murder requires a direct act of killing by the defendant or his accomplice has no bearing on the interpretation of La. R.S. 14:93(A)(1).

. At trial, defendant’s counsel argued she was guilty of negligent homicide.

. People v. Washington, 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130, 137 (1965); Alvarez v. District Court In and Por City and County of Denver, 186 Colo. 37, 525 P.2d 1131, 1132 (1974); Comer v. State, 977 A.2d 334, 340 (Del.2009); State v. Pina, 149 Idaho 140, 233 P.3d 71, 78 (2010); State v. Sophophone, 270 Kan. 703, 19 P.3d 70, 77 (2001); Campbell v. State, 293 Md. 438, 444 A.2d 1034 (1982); Com. v. Balliro, 349 Mass. 505, 209 N.E.2d 308, 314 (1965); State v. Branson, 487 N.W.2d 880, 882 (Minn.1992); State v. Rust, 197 Neb. 528, 250 N.W.2d 867, 875 (1977); Sheriff, Clark County v. Hicks, 89 Nev. 78, 506 P.2d 766, 768 (1973); State v. Bonner, 330 N.C. 536, 411 S.E.2d 598, 603 (1992); Com. v. Redline, 391 Pa. 486, 137 A.2d 472, 488 (1958); State v. Severs, 759 S.W.2d 935, 938 (Tenn.Crim.App.1988); Wooden v. Com., 222 Va. 758, 284 S.E.2d 811, 816 (1981).

. The rule of lenity requires this Court to resolve any ambiguity in a criminal statute in favor of the accused. See e.g., State v. Carr, 99-2209 (La.5/26/00), 761 So.2d 1271, 1274.

. The felony manslaughter statute is similar to the felony murder statute in that felony manslaughter is defined as “A homicide committed, without any intent to cause death or great bodily harm ... [w]hen the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person ...” La. R.S. 14:31(A)(2)(a).

. The cruelty to juveniles and second degree cruelty to juveniles statutes define the prohibited act as “the intentional or criminally negligent mistreatment or neglect” which causes "serious bodily injury or neurological impairment to that child,” La. R.S. 14:93.2.3(A)(1) or "unjustifiable pain and suffering.” La. R.S. 14:93(A)(1).

. Gross parental neglect prosecutions like the present one are infrequent and a relatively new area of developing law. See, e.g., Williams v. State, 235 S.W.3d 742, 767-68 (Tex.Crim.App.2007) (noting that "criminal prosecutions for tragic accidents are inherently troubling [and] also rare”). One commentator examined 92 reported judicial decisions involving fatal parental negligence and found that in 34 of the 92 cases a parent or guardian was prosecuted because of a failure to provide adequate supervision. See Jennifer M. Collins, Crime and Parenthood: the Uneasy Case for Prosecuting Negligent Parents, 100 NW. U.L.Rev. 807 (2006). Among those prosecutions, the most common causes of death were as follows: 12 cases involved accidental drowning, which resulted either from children being left unattended in a bathtub or from children being left unsupervised, allowing the children to wander outside and drown in a pool or other water hazard; 11 cases involved leaving young children home alone, who died when a fire broke out in their residence; and seven of the remaining cases involved deaths in automobiles. Id. at 818-19.
Several lack of supervision cases from other jurisdictions have resulted in criminal convictions. In Com. v. Skufca, 457 Pa. 124, 321 A.2d 889, 893-94 (1974), the court affirmed a *810 mother’s involuntary manslaughter conviction precisely because the unattended child’s accidental death was within the scope of the risk of which defendant should have been aware. See also State v. Meeks, 2011 WL 1743748 (Minn.App.2011) (defendant’s conduct in leaving children at her daycare unattended while she went to the store was a substantial factor in bringing about 22-month-old child’s death; victim died from being strapped too tightly into a car seat inside a playpen, was placed in that situation by defendant, defendant's daughter, or another child under their supervision; defendant should have anticipated that depriving the children at her daycare center of necessary supervision was likely to result in injury to one of them, even if she could not have anticipated the particular situation that caused victim's death); Barrett (Clark) v. Com., 41 Va.App.377, 585 S.E.2d 355, 367 (2003) (defendant’s felony child abuse conviction upheld when defendant took a nap, leaving two-year-old and ten-month-old unsupervised, and two-year-old drowned ten-month-old in bathtub; defendant knew two-year-old enjoyed playing in the bathtub, that she could turn on the "hot” water faucet to the tub on her own, and that she possessed sufficient strength to pull her ten-month-old sibling into the bathtub); Brockington v. State, 2003 WL 1738191 (Tex.App.2003) (defendant’s conviction for reckless injuiy of a child affirmed when (1) defendant had assumed the care and custody of victim, her five-year-old grandson, (2) defendant recklessly failed to provide the proper care for victim by leaving him alone at night in her residence, (3) defendant’s reckless conduct created a substantial and unjustifiable risk, (4) the burning of the house by some unknown person was a concurring cause of the victim’s injuiy and death, and (5) but for defendant’s omission creating the unjustified risk the child’s injury and death would not have occurred).

. In fact, the lack of supervision involved in this case seems to fit more succinctly into the crime of child desertion, which is "the intentional or criminally negligent exposure of a child ... to a hazard or danger against which the child cannot reasonably be expected to protect himself,” or the desertion of such child "knowing or having reason to believe that the child could be exposed to such hazard or danger.” La. R.S. 14:93.2.1. Of course, because the child died in this case, the defendant is guilty of much more than child abandonment.

. In Matthews, defendant was convicted of the second degree murder of Dorothy Penni-no and appealed contending, inter alia, that the state did not prove he caused her death. Defendant and a partner had beat the victim into unconsciousness and left her on the sloping bank of a canal. She drowned. The Matthews court found that "[w]hile the immediate cause of death was drowning, these acts of defendant were a clearly contributing cause even if the victim rolled, crawled or stumbled into the water.” Matthews, 450 So.2d at 646-47.

. In Durio, co-defendants were convicted of second degree murder after they beat Lucille Davidson during a home invasion and she died several days later from pneumonia while hospitalized. The Durio court found that medical expert testimony established that the victim contracted pneumonia because of her weakened condition following the attack, and therefore affirmed.

. While Matthews and Durio were second degree murder cases, the defendants in both cases committed direct acts of violence upon the victims. The substantial factor causation test came into play because there were multiple causes of the victim’s death in each case and the court had to determine whether the direct act of violence could be the legal cause of the death where another cause also contributed to the death.

. In Galliano, evidence of an incident in which the defendant had previously harmed his two-year-old victim was admissible to show a lack of accident at his trial for second-degree cruelty to a juvenile. The defendant's charge arose out of an incident in which the child sustained serious head injuries consistent with shaken baby syndrome. Galliano, 839 So.2d at 932. In the prior incident, the victim suffered a broken leg as a result of defendant applying excessive force to remove him from his car seat. Id. The defendant admitted to the act, but he claimed that the injury was an accident. Id., 839 So.2d at 933. This Court held:
The evidence of the prior incident in which the victim sustained a broken femur when defendant pulled him forcefully from his car seat has probative value to show the improbability that the defendant acted without the requisite intent, or accidentally, when he, according to his own admission, shook the victim in the instant situation "to get his attention.” See, State v. Monroe, 364 So.2d 570 (La.[1978]) (under the doctrine of chances, likelihood that defendant was required to kill twice in self-defense on successive nights at the same location was so remote that evidence of the other killing was admissible to negate self defense and lack of intent).
Galliano, 839 So.2d at 934. Finding no abuse of discretion in the trial court’s ruling admitting the prior act evidence, this Court agreed that evidence of the prior incident had "independent relevance to the issues of intent, system, and absence of mistake.” Id. at 934.