# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 23-780

**STATE OF LOUISIANA**

**VERSUS**

**DEON RAY BARTIE**

**\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, No. CR 2018-3552
HONORABLE JUDI F. ABRUSLEY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\***

## JONATHAN W. PERRY
## JUDGE

**\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Jonathan W. Perry, Judges.

**CONVICTION REVERSED.
JUDGMENT OF ACQUITTAL ENTERED.
SENTENCE VACATED.**

G. Paul Marx
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598
(337) 237-2537
**COUNSEL FOR DEFENDANT/APPELLANT:**
 Deon Ray Bartie

Liz Murrill
Louisiana Attorney General
J. Bryant Clark, Jr.
J. Taylor Gray
Louisiana Department of Justice
Post Office Box 94005
Baton Rouge, Louisiana 70804
(225) 326-6200
**COUNSEL FOR APPELLEE:**
 State of Louisiana

**PERRY, Judge.**

In this criminal appeal, Deon Ray Bartie ("Defendant") seeks to have his conviction for second degree murder reversed, contending that the evidence was insufficient to convict him of the murder of Brittany Lapeyrouse ("Lapeyrouse" or "the victim"). For the following reasons, we reverse Defendant's second degree murder conviction, enter a judgment of acquittal as to that charge, and vacate the sentence he received for that conviction.

## PROCEDURAL HISTORY

The facts of this case, which will be provided more fully later in this opinion, involve the death of Lapeyrouse on September 19, 2018. Shortly thereafter, on November 29, 2018, the Allen Parish District Attorney's Office filed a bill of information charging Defendant and two co-defendants with eighteen felony counts, including negligent homicide. Later, on March 13, 2020, the district attorney moved to recuse his office due to a potential conflict of interest. The trial court granted the recusal of the district attorney and his office and the Louisiana Office of the Attorney General ("the State") undertook the prosecution of Defendant.

On September 28, 2022, the State filed a superseding indictment charging Defendant alone with four felony counts: second degree murder, a violation of La.R.S. 14:30.1(A)(3); possession of methamphetamine with intent to distribute, a violation of La.R.S. 40:967(A)(l); possession of alprazolam, also known as Xanax, a violation of La.R.S 40:969(A)(l); and illegal carrying of weapons while in possession of controlled dangerous substances, a violation of La.R.S. 14:95(E). Defendant entered not guilty pleas to these charges on October 11, 2022.

Jury selection began on June 12, 2023, and the jury began hearing evidence the next day. After a five-day trial, the jury found Defendant guilty as charged on

all counts. On August 31, 2023, the trial court sentenced Defendant to life at hard labor for second degree murder; five years at hard labor for possession of methamphetamine; five years at hard labor for possession of alprazolam; and five years at hard labor for illegal carrying of weapons. All sentences were to be served concurrently.[1]

Defendant now seeks review of only his second degree murder conviction, assigning two errors.

## ASSIGNMENTS OF ERROR[2]

I. The conviction was based on a flawed definition of "direct cause" mandated in the statute. The evidence clearly demonstrated that the victim died after injecting heroin that a third party provided, evidence that but for her self-dosing heroin, she would not have died.

II. The court erred in refusing a defense request for a forensic toxicologist, where the critical evidence of what drugs were taken and whether direct cause was scientifically established. The court held that "you are not indigent" when you have private counsel.

### ASSIGNMENT OF ERROR NUMBER ONE:
### SUFFICIENCY OF THE EVIDENCE

### DEFENDANT'S ARGUMENT

Defendant contends that the State failed to prove that he sold the victim a drug which "directly caused death," an element of proof needed to convict him of second degree murder under La.R.S. 14:30.1(A)(3). In support of that contention, Defendant points to the fact that: (a) the victim died after injecting herself with

---

[1] Defendant has not appealed the following convictions: (a) possession with intent to distribute Controlled Dangerous Substance Schedule II, Methamphetamine; less than 28 grams, in violation of La.R.S. 40:967; (b) possession with intent to distribute Controlled Dangerous Substance Schedule IV, alprazolam, in violation of La.R.S. 40:969; and (c) illegal carrying of a weapon, in violation of La.R.S. 14:95(E).

[2] Defendant requested permission to file a pro se brief. We granted Defendant until March 27, 2024, to file his pro se brief. As of this date, we have not received Defendant's brief.

heroin; (b) someone other than Defendant supplied the victim with the heroin; (c) the person or persons who sold the heroin were not prosecuted; and (e) the State could not show how much heroin was in the syringe or what other narcotics were in the mixture. Defendant further argues that although the State contended that under La.R.S. 14:30.1(A)(3) it was only required to show that the drugs Defendant provided were a contributing cause, it failed to show that the drugs he provided were the direct cause of the victim's death. Instead, Defendant contends the State relied upon overwhelming 404(B) evidence of other crimes, wrongs, or acts to support its prosecution and conviction. In conclusion, Defendant asserts that contrary to that evidence, it is clear that but for the heroin and other drugs the victim took, she would not have died, and the State failed to prove what other drugs those were.

## THE STATE'S POSITION

The State contends that it proved the case against Defendant for second degree murder. It argues that it provided evidence to the jury that: (1) Defendant sold methamphetamine to the victim on the day she died; (2) the victim ingested this methamphetamine; and (3) this methamphetamine, either on its own or in conjunction with other narcotics, directly caused the victim's death. The evidence used to prove those elements came from: (a) testimony that Defendant distributed methamphetamine to the victim on the day of her death; (b) text messages from Defendant to the victim related to this narcotics transaction; (c) methamphetamines, packaged in bags similar to the bags Defendant used, were found in the victim's belongings; and (d) the toxicology report showed the presence of high levels of methamphetamines in the victim's system sufficient to cause her death.

Finally, the State points out that Defendant's arguments to the contrary are flawed because he relies upon a more restrictive federal statute and jurisprudence

3

regarding overdose deaths because of the distribution of a controlled substance.  It argues that such analysis is not proper because the Louisiana statute is less restrictive.  Nevertheless, the State argues that Defendant failed to present evidence that there was any error in the toxicology report which showed that the victim's system contained a lethal level of methamphetamines.

## STANDARD OF REVIEW

Defendant challenges the sufficiency of the evidence presented against him at trial regarding his second degree murder conviction.  The test for insufficiency claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)).  In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Additionally, the *Jackson* standard is applicable in cases involving both direct and circumstantial evidence.  In such cases, an appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  "When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence established must be sufficient for a rational

juror to conclude *beyond a reasonable doubt* that defendant was guilty of every essential element of the crime." *State v. Sutton*, 436 So.2d 471, 474 (La.1983).

In the present case, Defendant was convicted of second degree murder, a violation of La.R.S. 14:30.1(A)(3) (footnote omitted) which provides:

A. Second degree murder is the killing of a human being:

. . . .

(3) When the offender unlawfully distributes or dispenses a controlled dangerous substance listed in Schedules I through V of the Uniform Controlled Dangerous Substances Law, or any combination thereof, which is the direct cause of the death of the recipient who ingested or consumed the controlled dangerous substance.

To support Defendant's conviction under La.R.S. 14:30.1(A)(3), "the record must contain evidence that: (1) defendant distributed or dispensed [methamphetamine] to the victim, (2) the victim ingested or consumed the controlled dangerous substance, and (3) the victim died as a direct cause of ingesting or consuming the controlled dangerous substance." *State v. Hano*, 05-2090, p. 5 (La.App. 1 Cir. 6/9/06), 938 So.2d 181, 186, *writ denied*, 06-1713 (La. 1/26/07), 948 So.2d 164: *See also State v. Laue*, 20-225 (La.App. 1 Cir. 12/30/20), 326 So.3d 267, *writ denied*, 21-1329 (La. 11/17/21), 327 So.3d 993, *cert. denied*, ___U.S.___, 142 S.Ct. 2659 (2022).

### TRIAL EVIDENCE

On September 19, 2018, Defendant and the victim were part of a group whose main pastime on the day was spent using illegal drugs. In addition to Defendant and the victim, the group comprised Amberly Bonin ("Bonin"), Chris Pitre ("Pitre"), and

Michele Fontenot[3] ("Fontenot").  That day, the group gathered at the EconoLodge Motel ("EconoLodge") in north Lake Charles.

The State presented detailed testimony about the day's events from Bonin,[4] Defendant's former girlfriend.  Bonin testified that she met Defendant a few weeks before the incident at issue when he sold methamphetamine to her and a couple of friends, identified as Lacy and Gary.  Bonin further stated that she was friends with the victim, whom she had met months before the incident when both were jailed at the Calcasieu Correctional Center.  Bonin testified that she introduced Defendant to the victim on September 17, 2018, when they were doing drugs at the Days Inn motel in Sulphur.

Bonin stated that on September 19, 2018, the victim came to the EconoLodge at 4:00 a.m.  According to Bonin, the victim appeared to be fine when she arrived.  Shortly thereafter, the victim left with a friend, and she returned at about 9:00 a.m.  After the victim returned, Bonin witnessed the victim buy Xanax and methamphetamine from Defendant.  Although Bonin saw the victim ingest Xanax, she did not see the victim ingest methamphetamine.  Despite having those drugs, the victim also wanted to find heroin.  Bonin testified that Fontenot, another woman on the scene, called some men in Welsh to purchase heroin.  When the men arrived, Fontenot went to their car, bought heroin, and gave it to the victim.  At about 10:30 a.m., the victim and Bonin snorted some of the heroin.  Shortly thereafter, the pair went into the bathroom of the motel room.  There the victim injected heroin into

---

[3] Michele Fontenot was deceased at the time of Defendant's trial.

[4] Bonin was arrested and ultimately pleaded guilty to possession of narcotics and attempted possession of a firearm by a convicted felon.  As a result of those pleas, Bonin was sentenced to serve two years without benefit of probation and suspension of sentence, and seven years consecutive to the two years of all but the first year suspended and placed on three years' probation. As part of her plea agreement, Bonin further agreed to truthfully testify at Defendant's trial.

6

Bonin's arm; Bonin then started to wash her hair while the victim injected herself with the remainder of the heroin. After the victim injected herself, she then stood up, but her knees gave way, and she fell to the floor, still breathing but unconscious.

Bonin sat down on the floor and tried to aid the victim. While Bonin held the unconscious woman, Fontenot obtained a bucket of ice and put some on the victim's neck. According to Bonin, Defendant was upset by these events because the incident was "ruining our day." The group decided to go to a "chalet"[5] they had previously booked at the Coushatta Casino Resort ("Coushatta") through their friend, Greg Fontenot ("G. Fontenot"). Although the victim was unconscious, Bonin testified she was not worried; as a heroin user herself, she expected the victim to recover. Shortly thereafter, the group prepared to leave for the "chalet," a destination which G. Fontenot had secured at the Coushatta casino.

When G. Fontenot arrived in a vehicle, the unconscious victim was placed in the vehicle, and Pitre and Bonin also got into the vehicle and left. Defendant and Fontenot got into a Lyft. After meeting up at an area filling station, where Defendant apparently engaged in a drug transaction with a woman Bonin did not recognize, the members of the group proceeded to their chalet at the Coushatta casino. Bonin testified that all the while they were in G. Fontenot's car, she kept checking the victim's nose and observed her chest rise and fall. In Bonin's own words, "My mind set [sic] is still she [the victim] is gonna come out of this you know like I said I have seen it before it happened to me. I was just waiting for her to come out of it."

When they arrived at the chalet at about 3:00 or 3:30 p.m., the victim was still unconscious but alive. At this point, members of the group carried the victim inside

---

[5] Coushatta offers "chalets" as a lodging option. The lodging consisted of an open living room/kitchen combination, a bedroom, a bath, and a shaded desk for outdoor gathering.

the chalet and put her on the couch. Bonin walked to the back bedroom and stayed there for a short time. When she walked back up front to check the victim's condition, she found that the unconscious woman's lips were blue. At approximately 4:17 p.m., Bonin called the Coushatta front desk in spite of Defendant's desire not to involve the authorities.

In the intervening time, Bonin removed drugs from the victim's purse to avoid trouble. The drugs in the purse included those sold by Defendant, but there was also suboxone. Bonin stated that although Defendant regularly had possession of suboxone, she did not remember seeing Defendant in possession of this drug that day and did not recall seeing Defendant sell any to the victim that day. Nevertheless, Bonin did recall Defendant being in possession of other drugs that day, including methamphetamine, Xanax, and marijuana, and he also had scales.

Within minutes of receiving the call from Coushatta's front desk, Barry Granger ("Granger"), a member of the Coushatta Tribal Fire Department, arrived at the chalet. He testified that the victim was face down on the couch. According to Granger, the victim's body was cold, had no pulse, and she was not breathing. He also stated that there was vomit and foam coming from the victim's mouth. At this point, Granger began doing CPR and contacted the Allen Parish Ambulance Service ("the Ambulance Service").

Shortly thereafter, Thomas Groth ("Groth"), a paramedic with the Ambulance Service, took over CPR. After employing emergency procedures, he and his partner loaded the victim into the ambulance and proceeded to an area hospital at 4:35 p.m. Groth testified that the victim coded at the hospital at 4:59 p.m.

Under cross-examination, Bonin said that even though she and the victim were both heroin users, she never saw Defendant use heroin. Bonin also affirmed

8

that the heroin she and the victim used during the time at issue was provided by Fontenot.

Upon re-redirect examination and during re-cross, Bonin explained terminology found in texts she sent to Defendant in September 2018. She asked Defendant if he had any "dro" or "ice" to sell. She testified that "dro" is marijuana and "ice" is methamphetamine. She reiterated that she saw Defendant sell methamphetamine and Xanax to the victim on the morning of the day of the latter's death.

Detective Scott LeBlanc ("LeBlanc"), of the Coushatta Tribal Police Department, echoed some of Bonin's testimony as he identified drug-related terminology found in texts made from Defendant's phone.[6] Some of the terms referred to Xanax, methamphetamine, and Suboxone.[7]

LeBlanc testified that during a search of the chalet investigators located syringes, a crystal-like substance, and a plastic wrapper that read "Suboxone." The search also uncovered the victim's coin purse which Bonin had placed in the drawer of an end table; besides finding the victim's identification card in the purse, he found a small orange baggie with a crystal-like substance and Suboxone. When investigators also found a gun in a cereal box, LeBlanc testified they left the chalet and obtained a new, more expansive search warrant.

After re-entering the chalet, the investigators located scales and substances that appeared to be drugs, including methamphetamine and Suboxone in a bag

---

[6] LeBlanc confiscated the phone from Defendant. Several text messages from Defendant's cell phone were admitted via the testimony of Jerod Abshire, a digital forensic investigator with the Calcasieu Parish Sheriff's Office.

[7] According to LeBlanc, Suboxone is a prescribed medication for opioid addiction to try to get them off of certain opioids.

labeled with the victim's name. There was a white crystal-like substance wrapped in a tissue or paper towel[8] in a coffee pot. Items found in the bedroom included orange baggies with a crystal-like substance and multiple pills inside them. Investigators also found apparent narcotics in a pants pocket in a dry-cleaning bag in the armoire in the bedroom. They also found a green leafy substance. Subsequent lab testing confirmed that the seized substances included methamphetamine, marijuana, alprazolam, Suboxone, Clonazepam, and Hydrocodone. According to LeBlanc, even though Defendant gave a statement in which he admitted owning the clothes hanging in the armoire and the gun found in the duffle bag in the bedroom, he denied any knowledge of narcotics.

Defendant introduced testimony from his friend Pitre, a drug user who was present during the relevant events on September 19. Pitre testified that he saw the victim give heroin to Bonin four or five days before the victim died. On the date of the victim's death, Pitre, Bonin, and Defendant checked into a hotel on Highway 171 at about 11 a.m.; some other people arrived at some point, then the victim showed up at about 10 p.m. A few more people arrived, causing a crowded situation in the room. There were multiple people sitting on the two beds in the room. There was a continental breakfast in the lobby, and the victim began eating. After about twenty minutes, the victim left. Pitre testified that he did not see anyone give drugs to her during this interval, nor did he see her give drugs to anyone else. According to Pitre, when the victim left, she was gone for about six hours. On cross-examination, Pitre

---

[8] LeBlanc stated at trial that this substance was apparently methamphetamine. Even though this substance was submitted for testing, the Laboratory Report indicates that this off-white crystalline material weighed 1.29 grams, but it was not tested to determine the nature of the substance. The record is void of any testimony about this item and neither indicates who placed this into the coffee pot nor when it was placed there.

claimed he did not see any drugs when the party was packing up to leave the hotel and did not see any drugs when the party unpacked at the chalet.

Defendant testified in his own defense. He testified that he, Bonin, and Pitre checked into the EconoLodge in the late afternoon before the victim's death. That evening, the victim, who was a friend of Bonin, joined them, and they got high on meth and weed, watched TV, and clowned around. He stated that he never sold Xanax or meth to the victim.

Defendant further testified that the victim and Bonin had an argument, and the victim left for approximately six hours. However, he later testified it could have been as little as a single hour. After the victim came back, she and Bonin went into the bathroom. He knocked on the door because it was checkout time; he then opened the door and saw that Bonin had the victim in her arms. When he asked what was wrong, Bonin told him the victim had injected herself with heroin. Bonin and Pitre carried the victim out of the bathroom; another woman who was present, Fontenot, rubbed the victim with ice and advised that they should call 911. According to Defendant, Bonin did not want to call 911 because she advised him that the victim would recover.

When another friend, G. Fontenot, arrived with a car, they loaded up to go to the chalet. He said some of the others loaded the victim in the car while he was taking a bath. The party proceeded to the chalet but stopped at a filling station on the way. When they arrived at the chalet, Bonin, Pitre, and G. Fontenot got the victim out of the car and put her on a couch in the chalet. Defendant and Bonin went to lay down; about thirty minutes after they arrived, Pitre entered his room to state the victim was throwing up. When they went to check, the victim had vomitus on the side of her face, and Bonin called for emergency services.

11

The next person who testified was Dr. Christopher Tape ("Dr. Tape"), a forensic pathologist. Dr. Tape testified that the cause of death was "poly drug toxicity," i.e., death due to the multiple drugs in her body. Blood taken from the victim showed there was morphine in the victim's system, as well as fentanyl, methamphetamine, and amphetamine. Dr. Tape testified that heroin and codeine break up into morphine in the body. He testified that the methamphetamine and fentanyl played a particular role in the victim's death. Under cross-examination, Dr. Tape stated that the individual compounds, i.e., fentanyl, morphine, and amphetamine, found in the victim's body were each at high enough levels to cause death. On re-direct, the doctor affirmed this, also noting the same point (lethality) regarding methamphetamine.

## ANALYSIS

As discussed earlier in the trial evidence summary, Defendant's act of distribution of methamphetamine to the victim was proven through the testimony of Bonin. Pitre's denials that he saw anyone distribute drugs to the victim and Defendant's denials that he sold any drugs to the victim were matters for the jury to weigh regarding credibility. "It is well-settled that a jury is free to believe some, none, or all of any witness' testimony." *State v. Perkins*, 11-955, p. 10 (La.App. 3 Cir. 3/7/12), 85 So.3d 810, 817. Thus, applying the *Jackson* test and well-established jurisprudence, we consider this element of proof established.

Nevertheless, the matter of the victim's ingestion or consumption, another element of proof, is more problematic. While Bonin testified that Defendant sold methamphetamine and Xanax to the victim, she stated that she did see the victim consume the Xanax,[9] but she did not see the victim consume the methamphetamine.

---

[9] Curiously, the toxicology results Dr. Tape received did not identify Xanax as a drug that

Further, the State's medical expert, Dr. Tape, did not identify the time the victim may have used the drugs. On re-direct examination, the State asked him if the levels of narcotics found in the victim's system were consistent with ingestion earlier in the morning of the day of her death. His answer was "it could be." Shortly before that, defense counsel asked Dr. Tape whether the victim could have taken the drugs the day before her death. Dr. Tape replied: "Possibly and we get this thing [where] if you take more of [a] substance it will last longer in your system."

To buttress its argument regarding the sufficiency of the evidence, the State notes a text message on Defendant's phone from September 19 suggested the victim wanted to buy seven grams of methamphetamine from him. Also, the State observes that police found methamphetamine packaged in the victim's coin purse in baggies similar to that found in Defendant's luggage. According to the State, this was the 1.62 gram quantity noted by the crime lab. The State then argues that the weight difference between seven grams purportedly requested from Defendant and 1.62 grams found in the victim's coin purse must logically represent the quantity the victim consumed.

Circumstantial evidence is evidence that directly proves or disproves not the main fact in question, but a fact or circumstance from which the court can reasonably infer the existence or nonexistence of another fact. *State v. Effit*, 467 So.2d 856 (La.App. 2 Cir. 1985); *State v. Willis*, 446 So.2d 795 (La.App. 2 Cir. 1984).

In *State v. Chism*, 436 So.2d 464, 468–69 (La.1983) (footnote omitted), the court stated:

> In criminal cases, the rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438.

was found in the victim's system.

13

Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. Prosser, [Law of Torts, p. 212 (4ᵗʰ ed 1971)].

Considering the objective standard of appellate review enunciated in *Jackson*, the facts reflected in the record, and the arguments made, the question before us is simply whether the jury placed a reasonable construction on the evidence when it concluded the State proved beyond a reasonable doubt that Defendant committed second degree murder. Although we acknowledge that the State's counterpoint argument regarding the victim's consumption of methamphetamine is intelligent and echoes the State's similar rebuttal reasoning at trial, it does not fill two gaps in the evidence. First, the record does not demonstrate that Defendant distributed seven grams of methamphetamine to the victim. Specifically, even though Bonin stated that she saw Defendant sell methamphetamine to the victim, the record is void of any evidence which quantified the amount provided to her. Thus, the State's assertion is based solely upon speculation. Secondly, and more importantly, neither Bonin nor anyone else testified that the victim ingested the methamphetamine Defendant provided to her.

A conviction based on insufficient evidence cannot stand as it violates Due Process. *See* U.S. Const. amend. XIV; La.Const. art. 1, § 2. After carefully reviewing the record, we find the evidence was insufficient to support Defendant's

second degree murder conviction.[10]

## RESPONSIVE VERDICTS

Louisiana Code of Criminal Procedure Article 821(E) states:

> If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense.

In the present case, guilty of manslaughter and guilty of negligent homicide are the only lesser included offenses which may be rendered when a verdict of second degree murder is found unsupported by the evidence. La.Code Crim.P. art. 814.[11]

That portion of the manslaughter statute applicable to the facts of this case is La.R.S. 14:31(A)(2)(a) (emphasis added), the felony-manslaughter provision, which specifies that "[m]anslaughter is . . . [a] homicide committed, without any intent to cause death or great bodily harm . . . [w]hen the offender is engaged in the perpetration or attempted perpetration of **any felony not enumerated in Article 30 or 30.1**, or of any intentional misdemeanor directly affecting the person. . . ." Looking at the charging instrument, three felonies are enumerated—two involve the possession and distribution of alprazolam and methamphetamine and the other

---

[10] Having reached that conclusion, we do not address Defendant's second assignment of error.

[11] The record in the present case shows that the jury first retired for deliberation at 11:52 a.m. At 12:43 p.m. the jury asked the trial court to re-read the definitions for second degree murder, manslaughter, and negligent homicide. After hearing the definitions again, the jury returned for deliberation. At 1:34 p.m. the jury again requested the trial court to re-read the definitions for second degree murder and manslaughter; the trial court provided the definitions as requested. However, at that same time, the jury's request to take the jury instructions with them as it deliberated was denied by the trial court. Later, at 3:20 p.m. the jury sent a third note to the trial court, asking it about the indictment and again asking the trial court for the definitions of second degree murder and manslaughter. The trial court again provided the definitions but abbreviated them and returned the jury for deliberation. At 4:42 p.m., the jury returned its verdict, finding Defendant guilty of second degree murder.

15

pertains to Defendant's possession of a weapon during the sale or distribution of a controlled dangerous substance.

The facts presented at trial established that Defendant was engaged in a felony enumerated in La.R.S. 14:30.1, the distribution of alprazolam and methamphetamine. Thus, those felonies cannot form the basis for a felony-manslaughter conviction. La.R.S. 14:31(A)(2)(a).

In addition, the facts presented at trial included that Defendant was in possession of a weapon while in possession of and during the distribution of a controlled dangerous substance and he was prosecuted accordingly. In evaluating that possibility, our attention is drawn to *State v. Brown*, 15-855, pp. 4–5 (La.App. 4 Cir. 10/21/15), 176 So.3d 761, 765, *writ denied*, 15-2250 (La. 2/5/16), 186 So.3d 1167 (footnotes omitted) (emphasis in the original), where the court stated:

> [A]lthough La. R.S. 14:31 A(2)(a), the felony-manslaughter provision, does not specifically set forth a causal requirement between the underlying or predicate felony and the death, such an essential element must be read into the statute. The Louisiana Supreme Court has held that, in a prosecution for felony-manslaughter, the prosecution is still required to prove that the "defendant's conduct was a legal cause of the killing." *See State v. Kalathakis*, 563 So.2d 228, 231–33 (La.1990). The Court has also found that a "causal relation between the defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime." *Id.; see also State v. Kenny*, 11-1819, pp. 8–9 (La.App. 4 Cir. 5/29/13), 116 So.3d 992, 997. Noting that the underlying felony and unlawful killing must somehow be related, the Court in *State v. Myers* found that the prosecution had to prove the defendant and his co-perpetrator were engaged in the perpetration of a felony not enumerated in La. R.S. 14:30 or 14:30.1 *and* that the victim was killed in furtherance of the commission of this felony. *See Myers*, 99-1849, p. 9 (La. 4/11/00), 760 So.2d 310, 316.

Applying the foregoing to the present case, the record is void of any evidence to relate Defendant's possession of the weapon to the victim's death. Therefore, a responsive verdict under the felony-manslaughter provision is not supported.

16

We next turn our attention to negligent homicide, the final lesser included offense which may be rendered when a verdict of second degree murder is found unsupported by the evidence. Particularly, we focus on whether Defendant's failure to call medical help for the victim would support a conviction for negligent homicide.

Louisiana Revised Statutes 14:32(A)(1) states that "Negligent homicide is. . . the following: (1) The killing of a human being by criminal negligence." Criminal negligence is defined in La.R.S. 14:12: "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances."

In *State v. Small*, 11-2796, p. 21–22 (La. 10/16/12), 100 So.3d 797, 811–12 (footnotes omitted), the supreme court explained causation in the context of negligent homicide:

> [U]nlike second degree murder, negligent homicide does not require a "direct act" of killing by the defendant. Negligent homicide is "the killing of a human being by criminal negligence." La. R.S. 14:32. "Criminal negligence exists when although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. R.S. 14:12. Ordinary negligence does not equate to criminal negligence; the state is required to show more than a mere deviation from the standard of ordinary care. *State v. Jones,* 298 So.2d 774 (La.1974). . . .
>
> Regarding causation, this Court has addressed the type of causal connection the state must show between a defendant's conduct and the victim's death for a defendant to be criminally culpable where multiple causes led to the death. In *State v. Matthews*, 450 So.2d 644 (La.1984), we held that "[i]t is not essential that the act of the defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree

17

sufficient to be a clearly contributing cause, that is sufficient." *Matthews*, 450 So.2d at 646 (quoting *State v. Wilson*, 114 La. 398, 38 So. 397 (1905) (involving death from pneumonia caused by gunshot wound)). The *Matthews* court noted that a similar standard for determining causation-in-fact approved by LaFave and Scott in their treatise on substantive criminal law was adopted by the Court in *State v. Durio*, 371 So.2d 1158 (La.1979). *Matthews*, 450 So.2d at 646. In *Durio*, this Court found that the state could establish causation by showing that the "defendant's conduct was a substantial factor in bringing about the forbidden result." *Durio*, 371 So.2d at 1163–64. In *State v. Martin*, [539 So.2d 1235 (La.1989)], we upheld Martin's conviction as a principal to negligent homicide even though it was his partner in a drag race who struck the victim's vehicle. We held that Martin's participation in the drag race was a "substantial factor in the victim's death." [*Id.*], 539 So.2d at 1239.

Returning to the present case, the record shows that the victim was breathing when she initially passed out, and it was not clear at that moment that the victim was in danger. Bonin, a heroin user herself, testifying for the State, stated that "I have seen heroin users pass out after doing it and then later come too [sic] so I thought that the same thing was happening that she[,] you know[,] just did a little too much. But she [the victim] was [gonna] come too [sic]."[12] Although the victim was unconscious, she was still breathing and had not manifested any obvious symptoms suggestive of her dying. That situation remained unchanged and continued until Defendant and other drug-using companions moved the victim to the chalet. Due to Bonin's firsthand knowledge as an experienced heroin user and her recommendation

---

[12] In *State v. Richard*, 23-523, p. 11 (La.App. 3 Cir. 3/20/24), 381 So.3d 1087, 1094, the testimony of Dr. James Lynn Bordelon, an expert in the field of general medicine and investigation of deaths, was summarized as follows:

> [H]eroin is an "opioid medication" that "slows down everything in the body," creating a "neurological high." Heroin slows down one's breathing, heart rate, and gastrointestinal system and causes "pinpoint pupils." Dr. Bordelon stated a chronic user of heroin normally passes out or sleeps after ingesting the drug, and depending on the metabolism of the individual, a heroin user can sleep for a long period of time. For clarification purposes, on re-direct, Dr. Bordelon stated that the medical term "unconscious" and the street term "passing out" were "synonymous with one another.

that further attention was not needed, no one called 911. It was not until Bonin examined the victim again in the chalet and found that the victim's lips were blue that she realized a medical emergency presented itself. At that point, Bonin called for medical assistance.

Against that backdrop, Bonin further testified that Defendant was upset when the victim first passed out after she mainlined heroin because it was going to ruin their day. Later, Bonin recounted that after the victim's condition worsened, Defendant did not want to call emergency services and, in fact, did not call for help. It was at this point that Bonin called for medical help. As we analyze our initial query of whether Defendant may have been guilty of negligent homicide, the question arises whether under these facts it was already too late to save the victim's life.[13]

Our review of the record shows that Dr. Tape's testimony does not address this issue. According to Granger, the Coushatta emergency responder, when emergency personnel removed the victim from the couch her body was cold, and she had vomit and foam coming from her mouth. Groth, the paramedic from the Allen Parish ambulance service who relieved the Coushatta emergency response team, gave testimony that mirrored Granger's. Groth further stated that shortly after the ambulance service transported the victim to the hospital, the doctor called the code.

---

[13] Even though Defendant was not so charged, we note that with an effective date of August 2019, one month prior to the victim's death in the present case, La.R.S. 14:502 was enacted and provides, in pertinent part, that: "[a]ny person at the scene of an emergency who knows that another person has suffered serious bodily injury shall, to the extent that the person can do so without danger or peril to self or others, give reasonable assistance to the injured person." Commenting on this statute in his concurrence to *Richard*, 381 So.3d at ___, Judge Kyzar stated:

> [T]he purpose of the bill [enacting La.R.S. 14:502] was to attempt to save lives of persons engaging in the reckless drinking of alcohol and/or use of dangerous drugs by penalizing those who participated in the activity with the injured or deceased person and who fail to contact 911 or seek help for fear of reprisal because they too were engaged in the activity along with that person.

In *Small*, 100 So.3d 797, the supreme court relied on *Matthews*, 450 So.2d at 646, a case which held that "[i]t is not essential that the act of the defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient." Based on the record evidence, we find that a responsive verdict of negligent homicide is not justifiable. Initially, when the victim was unconscious, but still breathing, Defendant was not negligent as Bonin, the heroin-experienced friend of the victim, counselled against the need to call 911. Later, when Bonin saw that the victim had vomited and her lips were blue, the medical crisis became clear, but Defendant's inaction did not cause the victim's death or may even be considered a substantial factor in her death. Moreover, once it was visible that the victim's health significantly worsened, Bonin did call for medical assistance but to no avail.

Therefore, we find that the record does not support either responsive verdict of guilty of manslaughter or negligent homicide.

## DECREE

The evidence was insufficient to sustain Defendant's conviction of second degree murder, a violation of La.R.S. 14:30.1. Therefore, Defendant's conviction for second degree murder is reversed, a judgment of acquittal is entered as to that conviction, and his sentence for that conviction is vacated.

**CONVICTION REVERSED; JUDGMENT OF ACQUITTAL ENTERED; SENTENCE VACATED.**